[No. 24235. *En Banc.* July 25, 1933.]

LENORE C. WHORF, *Appellant,* v. THE SEATTLE
NATIONAL BANK et al., *Respondents.*[1]

*J. W. Robinson* and *Edgar S. Hadley,* for appellant.
*Bausman, Oldham, Cohen & Jarvis,* for respondents.

STEINERT, J.—The plaintiff brought this action to
recover upon a check for sixteen hundred dollars,
drawn to her order on the defendant, Seattle National

[1]Reported in 24 P. (2d) 120.

Bank. It is alleged that the check was forcibly taken from plaintiff and her endorsement forged thereon, the amount of the check being thereafter paid by the bank to the wrongdoer who presented it. At the close of the plaintiff's evidence, she rested. The defendants thereupon rested without submitting any evidence, and the court subsequently entered a judgment dismissing the action with prejudice. The plaintiff has appealed.

While the judgment recites that the court had theretofore rendered a written opinion and had made its findings of fact and conclusions of law, these do not appear in the record. A reading of the statement of facts in the case discloses an aberrant and somewhat confusing story. Separated from the frequent objections interposed, the consequent argument of counsel and the many explanations and repetitions, it may be summarized as follows:

Appellant, Lenore C. Whorf, evidently a woman of mature years and with some experience in business affairs, had been acquainted with a man by the name of William L. Dierssen for forty years, as she says, and had had numerous business transactions with him. At one time, she had been engaged to marry him.

On January 22, 1929, she, accompanied by Dierssen, went to the office of A. W. Leonard, the drawer of the check, and there gave to Leonard her promissory note for sixteen hundred dollars, due thirty days after date, and as consideration for the note she then received from Mr. Leonard the check in question for a like amount. If anything else was said or done at that time, it is not disclosed, but the fact that Dierssen was present, coupled with other facts hereinafter related, indicates that he was probably interested personally in the disposition of the proceeds of the check.

With the check in her purse, the plaintiff, still accompanied by Dierssen, left Mr. Leonard's office and pro-

ceeded to the office of a lawyer who was in some way concerned in the transactions which were to be consummated by the use of the check. While appellant and Dierssen were in the reception room of the law office waiting to see the lawyer, Dierssen knocked the purse from appellant's hands, picked it up and possessed himself of the check, refusing to return it. When the lawyer in whose office they were appeared, Dierssen exhibited the check, keeping it in his own hands, but promising to produce it at a conference to be held the next morning at another law office, at which a number of different persons were to be present. Apparently, he gave the idea that he was going to see that the check was used for the purpose for which it was intended. Nothing further with reference to the check occurred that day.

The next morning, appellant and Dierssen had breakfast together, again discussed the check and the matter of its possession, and then went to the other law office, where there was an appointed meeting of a considerable number of persons, all interested in some transaction in and about which the check was apparently intended to be used. This conference seems to have lasted an hour or two. Dierssen absented himself from the meeting once or twice for a short time, but each time returned and apparently participated in the conference. Finally, matters appear to have reached the stage where the check had to be produced or else accounted for, and Dierssen then said that he had cashed the check, but that he had the money and would produce it. The lawyer charged Dierssen's act of cashing the check as forgery. Dierssen, resenting this, was about to make an attack on the lawyer, but was prevented from so doing when the lawyer directed his stenographer to call the police. Dierssen

offered to produce the check or the money if the police were not called.

The appellant and Dierssen's father then went with Dierssen, at the latter's invitation, to the bank on which the check was drawn, Dierssen saying that he would there get the money realized from cashing the check and give it to them. While in the bank, Dierssen seems to have had some conversation with one of its officers, the nature of which, so far as is disclosed, had nothing to do with the check. Dierssen then said to appellant that he had the money in his pocket, that they would go to lunch together, and that he would there give her the money.

Up to this time, notwithstanding Dierssen's statement that he had cashed the check, appellant seems not to have believed that possible, and, relying upon the fact that she had not endorsed the check, and not believing that Dierssen would forge her name, she was still expecting that, instead of the money, Dierssen would give her the instrument itself. In this state of mind and under these conditions, appellant with Dierssen and his father proceeded to a restaurant, where they intended to have lunch. Arriving at the door of the restaurant, Dierssen instructed the others to go in and order for him, saying that he would join them in a few minutes. This suggestion was followed, and Dierssen went his way, but did not return, as he had agreed.

Appellant, becoming suspicious by reason of Dierssen thus failing to join her at the restaurant, proceeded, after her luncheon, to the bank on which the check was drawn, for the purpose of giving to the bank a stop-payment order. Arriving there and making known her errand, she was at once informed that the check had already been cashed by the bank. It now appears from the check, which is in evidence, that

there is endorsed on the back thereof the following: "L. C. Whorf," below that "Wm. L. Dierssen," and below that in pencil "OK La." The officer or employee of the bank whom the appellant first met apparently sent for the check and exhibited it to her. Thereafter, to quote her testimony, the following occurred:

"Q. Recite the conversation you had with Mr. LaGrave. A. This man, when the check came down, when he looked at the back of it, he went over and got a man—he said 'I will get the man who O. K'd that,' and he brought this man over and introduced me to him. Q. Who was that man? A. I have forgotten the name of the man at the statement window, but he introduced me— Q. (Interposing) To whom? A. Mr. LaGrave, he said, the man that O. K'd this. He asked him how he came to O. K. it, and he explained to him that he had known this man Dierssen for a great many years, and he told him he was going to open an account there at the bank, and that is why he did that. And he also said he was an officer of the bank."

It further appears that, later, the bank in some way gained access to a safety deposit box belonging to Dierssen but rented in a name other than his own, and there found a considerable sum of money, mostly in one hundred dollar bills, such as had been paid to Dierssen when he cashed the check. Of the money so found, variously stated at from eight hundred to eleven hundred and fifty dollars, it appears that the bank paid to Mr. Leonard, the drawer of the check, five hundred or five hundred and fifty dollars, and that the remainder was turned over to an attorney, for what purpose does not clearly appear. There is also some evidence that the bank later obtained a mortgage from Dierssen on real estate belonging, or supposed to belong, to him. The mortgage was taken by the bank to secure the payment of the sum of sixteen hundred dollars, but whether the mortgage was of any value

is not shown. There is considerable other testimony, the relevancy of which is somewhat obscure, but through it runs the suggestion that, when the check was drawn, Dierssen was interested in the use to be made of its proceeds, and to a certain extent was to be benefited thereby.

So far as the record discloses, appellant's promissory note given to Leonard has never been returned to her, nor has she been given any evidence of any credit thereon. She testified that she still considered herself indebted to Leonard for the amount of the note. We are not advised as to who holds the note at the present time. Mr. Leonard, who might have thrown light on some of these matters, was said to be ill at the time of the trial. Though it was at one time suggested that the hearing be continued on that account, no continuance was had and he did not testify in the case.

As we have narrated the facts, they may sound as though they were introductory to a criminal action. We have, however, only a civil matter before us for determination.

We are concerned chiefly with the effect of the negotiable instruments act upon so much of the present transaction as concerns the payee and drawee of a check whereon the payee's endorsement has been forged. The principal question before us is: Did the bank, the drawee, under the circumstances narrated, accept the check within the legal definition of acceptance?

The mere giving of the check to the appellant, of itself, created no right in her as against the bank on which it was drawn. So far as she was concerned, the bank was lawfully entitled, had she herself endorsed and presented the check, to refuse payment for any reason, or for no reason at all.

"A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder *unless and until it accepts* or certifies the check." (Italics ours.) Rem. Rev. Stat., § 3579.

"A bill of itself does not operate as an assignment of the funds in the hands of the drawee available for the payment thereof, and the drawee is not liable on the bill *unless and until he accepts* the same." (Italics ours.) Rem. Rev. Stat., § 3517.

*National Market Co. v. Maryland Casualty Co.*, 100 Wash. 370, 170 Pac. 1009, 174 Pac. 479.

██ It thus becomes necessary to determine whether, in this case, there was an acceptance of the check by the bank. Rem. Rev. Stat., § 3522, defines acceptance as follows:

"The acceptance of a bill is the signification by the drawee of his assent to the order of the drawer. The acceptance must be in writing and signed by the drawee. It must not express that the drawee will perform his promise by any other means than the payment of money."

By Rem. Rev. Stat., § 3575, a check is defined as a bill of exchange drawn on a bank payable on demand. Section 3579, *supra,* indicates that there may be an acceptance otherwise than by a formal certification.

In *Oregon Iron & Steel Co. v. Kelso State Bank,* 129 Wash. 109, 224 Pac. 569, 38 A. L. R. 178, it was held that, when a bank takes a check, marks it "paid", and charges the depositor's account with the amount of it, it thereby assents to the order of the maker and becomes liable to the *holder* of the check for its amount. In this connection, however, it must be understood that "holder" is defined in Rem. Rev. Stat., § 3581, as the *payee* or *endorsee* of a bill or note who is *in possession* of it or the bearer thereof. The same section defines "bearer" as the person in possession of a bill or note

which is payable to bearer. It will be noted that appellant was not herself in possession of the check at the time of its presentment to the bank.

The form of notation made by the bank's officer on the check suggests an interesting question as to whether, under a conventional presentment by the payee or lawful holder, such endorsement would constitute an acceptance by the bank. That question, however, becomes immaterial here because of another principle which we deem controlling. We therefore do not pass upon the point, although it is discussed in the brief.

This is not a case where the payee or true holder presents the check for acceptance, but one where a forger presents it. Therein lies a vital distinction. The distinction becomes clear when we recognize the legal effect of an acceptance, and what it entails. A valid acceptance changes the rights of the payee and the liabilities of the drawee. It becomes a new contract, and essentially changes the position of the parties. The privity of contract between drawer and drawee is ended, and in its place arises a new privity, one between drawee and payee. The drawer's liability on the check is discharged, and the drawee's liability is substituted therefor. 5 Michie on Banks and Banking, § 210, p. 386.

An acceptance being a new contract, it must possess the essential elements of a contract. It is indispensable to a valid contract that there be a meeting of minds, and there can be no such meeting of minds without the knowledge and consent of the parties. A bank can not accept a check, legally speaking, without the knowledge and consent of the party to whom it is to be bound. 5 Michie on Banks and Banking, § 211-a, p. 388. There obviously was no meeting of minds or manifestation of consent in this case unless Dierssen was the authorized

agent of the appellant; and, of course, if he were her agent, then payment to him was properly made.

It is the rule that payment of a check on an unauthorized or forged endorsement does not operate as an acceptance of the check so as to authorize an action by the real owner to recover its amount from the drawee bank. 5 Michie on Banks and Banking, § 278, p. 521. A full list of the authorities supporting the rule will be found in a footnote to the foregoing citation. See, also, 69 A. L. R. 1068.

The rule which we have just announced obtains in this state. In *Anderson v. National Bank of Tacoma,* 146 Wash. 520, 264 Pac. 8, we said on p. 526 of the state report:

"And even payment by the drawee bank on an instrument which is actually forged gives no right of action to the true payee or holder against the paying drawee bank."

We must therefore conclude that the appellant has no right of action against the bank upon her theory that the bank accepted the check.

■ Appellant further contends that the conduct of the respondent bank was such as to work an estoppel against any defense against appellant's action. We can not agree with this contention. There was no misrepresentation made by the bank, and none of its acts in any way misled appellant or induced her to act to her injury. When she lost the check, she did not lose her rights against the drawer, because, the check having been paid on a forged endorsement, the drawer did not lose his rights against the drawee bank. The appellant still has all the rights she ever had against Leonard, the drawer of the check. On the other hand, the bank lost the amount paid on the check, unless it collected from the forger. Collection from the forger in no way prejudiced, or could prejudice, the rights of

the payee against the drawer. Even if the bank were negligent in cashing the check upon the forged endorsement, that negligence resulted only in loss to itself and not to the appellant. We conclude that there was no estoppel, so far as the bank was concerned.

The judgment is affirmed. ·

BEALS, C. J., TOLMAN, HOLCOMB, and MILLARD, JJ., concur.

MAIN, J. (concurring in the result)—I agree with the holding in this case to the effect that the payment of a check on an unauthorized or forged endorsement does not operate as an acceptance of the check so as to authorize an action by the real owner to recover its amount from the drawee bank, and also that there are no facts showing an estoppel, but there are some things in the opinion with which I am not in accord, and which do not appear to me to be necessary to the decision of the case. I therefore concur in the result.

MITCHELL and BLAKE, JJ., concur in the result.